PENSION FUNDS v. WATSON PHARMACEUTICALS PENSION FUNDS v. WATSON PHARMACEUTICALS PENSION FUNDS v. WATSON PHARMACEUTICALS May it please the Court, I'm Joseph Daly for the Appellant's Pension Funds, who seek to have the District Court's erroneous lead plaintiff order overturned. I'll keep an eye on my time, but I hope to reserve five minutes for rebuttal. Your Honors, the District Court's order went against both the PSLRA's clear statutory text as well as this Court's precedent in the Kavanaugh case. That statute mandates that the presumption that the most adequate plaintiff in a class action is that one with the largest financial interest in the relief sought by the class. And Kavanaugh says that the PSLRA's text provides that, quote, the only basis, the only basis, and that's this Court's emphasis, not mine, on which to compare lead plaintiffs is the size of their financial stake in the controversy. And here, Anchor Capital, as an investment advisor, simply had none. It had no financial stake, it had no losses in the stock, and it had no permission to sue on behalf of its clients who truthfully experienced those losses. Now the District Court seemed to recognize this at first. It engaged in several minutes of colloquy with counsel for Anchor Capital, and I would like to take this opportunity just to read some of that colloquy. Judge Matz says to counsel, now I see the language in the declaration saying that you have attorney in fact power, but that's not quite as explicit as I would have liked. What kind of documentation accompanies the creation of the attorney in fact status that Anchor represents and it has? And then the counsel, they go back and forth a little more colloquy, and then Judge Matz says, but the language in your declaration says that Anchor is an attorney with full power and authority to bring suit to recover investment losses. Do you have any copies of the standard contracts that you enter with your clients? And then again, Mr. Cech, the counsel for Anchor Capital, engages in some more colloquy and says, well, I've met with the president and the CEO of Anchor Capital, Mr. Rice, and we talked about those investment contracts and what they mean and how they give him power of attorney. And Judge Matz says, well, now wait a minute. You are slipping over exactly what I'm asking you to establish. You are just asserting that they have the power to sue, but I need something more than that. And finally, near the end, I want to see some corroboration of the assertion that Anchor in fact has the authority to sue. I'm appointing you lead plaintiff, but I'm conditioning it on additional documentation that gives me the corroboration for the assertion in paragraph three of the declaration. And your honors, that corroboration never came forward. Anchor was never able to show that it indeed had attorney-in-fact authority. In fact, on its third and final declaration, it very conspicuously jettisoned that language saying that it had attorney-in-fact powers and said something nebulous about how it could be inferred or was the intent of the contract that it was to be the attorney-in-fact. And that, of course, that contract was to be considered under Massachusetts law, which is very clear. A contract in Massachusetts is limited to the four corners of the document. There can be no implication, no inferring from the language of the contract. It is what is in the contract that matters. And it is at that point that this Court's decision in Kavanaugh says that the district court should have gone to the second putative lead plaintiff in line, and that was my clients with $1.2 million in declared losses. Because it was at that point that Anchor's typicality, it had no claims typical with other class members because it had no loss, it had no claims. Its typicality and its adequacy, perhaps more importantly, its adequacy to represent the absent class members was thrown into doubt. Counsel, I want to stop you there. I hate to interrupt you because you're on a roll, but let me, I've got a couple of questions about the procedural posture of all of this. Did your client file a complaint in this case? No. No, they did not, Your Honor, and they don't have to. Okay. Did you file a complaint after this complaint was dismissed? After the parties, after Anchor came in and indicated that they would not be filing an amended complaint? No, we did not. There was a space of three days within which Anchor came in and said, you know what, Judge Matz, we understand you've granted us leave to amend, but we are not going to amend. Would you please enter judgment against us? So there was a space of three days there. Also at that point. A space of three days between what? A space of three days between them coming in before Judge Matz and saying, please dismiss us with prejudice, and then entry of judgment. Keith, is the entry of judgment, dismissing with prejudice, binding on your clients? So that you cannot file a complaint today? No, it isn't. But, Judge Bybee, what happened at that point was the entry of judgment made ripe all prior interlocutory orders in that case. The order that aggrieves my clients is the erroneously plaintiff order. Well, I understand that you're unhappy with that. Yes. I understand that. But why couldn't you just have cured the whole thing by filing your own complaint? Saying, look, if Anchor doesn't want to go forward with it, that's fine. We're happy to go forward with it. Here's our complaint. Why couldn't you have done that? Two reasons, Your Honor. First, we did not just want to file suit on behalf of ourselves. We were seeking to lead a class action on behalf of a class of perhaps many thousands of shareholders of Watson Pharmaceuticals. Don't you have thought class action status? I don't believe so. And that's my second reason. I think under American Pipe tolling, although our claims were told, pardon me, although our claims would have been told, statute of limitations would have been told until a denial of class certification, or perhaps in this case, the entry of judgment, I think cases subsequent to American Pipe make it very clear that courts are not going to let the American Pipe tolling doctrine allow parties, allow plaintiffs, that is, to piggyback class actions one upon the other. Do you see what I'm saying? Well, yeah, except that you're not really piggybacking. If somebody has said we've decided not to go forward with an amended complaint, let's dismiss the prior complaint. How would that be piggybacking? Well, the statute of limitations had not run. Yes, of course not. Had not run. Well, let's see now. Well, no, they had been told, had been told, so statute of limitations had not run. This is an unusual animal in that, remember, we had come in originally and tried to be appointed lead plaintiff. I have no doubt that had we come back in with a second complaint and said to the same district court judge, here's a new complaint against Watson Pharmaceuticals, and now we would like to be the lead plaintiffs on behalf of another class. And I'm sure the past counsel — Anchor didn't have to disclose to the district court what its motivation was for not going forward. It could have been our attorneys have problems with the Rule 11 warning that you gave and they've been scared off. Or it could have been we don't think we've got the financial wherewithal to do it. Or it could have been we've heard from enough of our clients that they don't want us to go forward. We're a little nervous about the relationship and some bad law getting established here, so we're simply going to withdraw. If that had been true, you would have had a pretty powerful argument for coming in before Judge Maitz and saying, we're the runner-up in the Miss America contest here, and when the queen doesn't serve, we get to step in and wear the crown. I agree, but interjecting reasons such as we don't have the financial wherewithal to run this action, to file an amended complaint, I mean, those are the sort of concerns that Anchor, as a lead plaintiff, should have thought of at the very beginning of the case. Sure, but from your client's perspective, that's all irrelevant. It doesn't matter what reasons they've withdrawn, even if they withdrew for no good reason at all. Why didn't you go to Judge Maitz and say, we're the runner-up, we're going to file a complaint, and we now want to be certified as the lead plaintiff in this? I cannot speak to the litigator's strategies at that time, but looking at it from my standpoint, I would have thought they would have had grave concerns over the district court judge saying, you are improperly trying to piggyback a second-class action upon a first one. It just happens to be pure happenstance that I did not certify that original class action and then dismiss it with prejudice. I'm not going to allow you to do that. So was the original class action ever certified? It was never certified. It was not certified. But nonetheless, we had this lead plaintiff order outstanding there, floating out there, that had aggrieved us. This court said in the Z7 case that those lead plaintiff orders are appealable after final judgment, and in keeping with Z7, that's exactly what we did. We waited for final judgment. At the same time, Judge Bybee, we had an outstanding mandamus petition pending before this court. Has the statute of limitations now run but for this appeal? Has the statute of limitations now run? I don't know the date. The class period is November 99 to November 01. I just don't know the answer to that, Your Honor. Had Judge Mates at that point gone back and done what he was supposed to do under the statute, which was to hold an evidentiary hearing and make a renewed determination of lead plaintiff status, no doubt he would have found that the submissions of Anker did not meet the standards, and he would have had to turn to the next lead plaintiff in line, our clients. Now, the judge relied upon some authority from the Western District of Pennsylvania, two opinions from the same judge, the Ezra cases, and a case out of the Southern District of New York, the Weinberg case. The Ezra decisions themselves contradict with this court's authority in Kavanaugh in that the judge there felt that the financial interest of the investment advisor was the fact that that advisor wanted to correct sort of the wrong that it had foisted upon its clients with its bad investment advice. And in the judge's mind there, the investment advisor's incentive to get back into its clients' good graces provided for the incentive sufficient under the PSLRA. And that's just not what Kavanaugh says. The only basis upon which to look at a lead plaintiff is the financial stake of that lead plaintiff. And the Weinberg case out of the Southern District of New York... Your point is, I guess, that a derivative financial stake is not enough. In other words, the fact that Anker's customers have a financial stake, and maybe under Massachusetts law Anker has an obligation to protect that stake, is not enough to make that a financial stake. Is that correct? Agreed. And we are not saying... As you see it, would any of Anker's customers qualify as purchasers of the securities? I would say they all qualify as purchasers. I mean, I understand there was this distinction in the briefing between with Anker saying, you know, actually our own clients were not actually purchasers here, but that has to be wrong on two levels. First, when Congress enacted the PSLRA, it specifically wanted large institutional investors to come in and take hold of the litigation as lead plaintiffs. Most, if not all, large institutional investors use investment advisors, whether in-house or often out-of-house, like Anker, to actually advise them and guide them on what stocks and bonds to purchase. So if that were true, if the hyper-technical focus upon who actually purchased that particular share were true, we would be doing away with an entire category of institutional investors. My second point in response to that is when you look at that Anker contract... I'm sorry, I'm at a total loss there. I heard what you said, but I don't understand it. Are you suggesting to me that if, or to the court, that if an investment advisor comes and says, buy X to Chase Manhattan Bank, let's say, and Chase says, yeah, go ahead and buy it. They buy X in the name of Chase or in the name of whoever Chase puts up. That Chase is not the purchaser? No, that is... Go ahead. No, Judge, I'm sorry if that's the impression I gave. That is the argument that Anker wants to make. That is the argument that Anker has actually made in its briefs, that it indeed is the purchaser and perhaps not even its own clients. I'm saying both Anker can be the purchaser and acting as an agent for its clients. Of course, its clients are purchasers. And when Anker makes an investment decision, it actually tells a broker to go buy that stock. So there's a third level of purchasers there, too. But the agency relationship between Anker and its clients, there's nothing wrong with Anker's clients coming forward to bring suit as purchasers under the securities laws. But the fact here is that there's nothing in the record to show that its clients gave Anker the permission to step into their shoes and to claim their $3.2 million in losses. In fact, Judge Maitz had before him a declaration from the Massachusetts Fund that was submitted saying that Anker is including losses within their $3.2 million that belong to us. That wouldn't have changed the dollar amount, would it? In other words, Anker would not have fallen to second place even if he took the Massachusetts group out. Isn't that right? That is true. And I would like to actually segue briefly. I noticed last night as I was preparing here, there's a misstatement in my briefs. I say that the Massachusetts Fund had over $1 million in losses. Upon rereading the declaration, it's clear that they said they had over $1 million in purchases of Watson stocks. So their losses perhaps, based on the stock drop in the class period, may be 40% of that. And I apologize to the Court as well as to opposing counsel. No, that would not have changed the calculation. But it also does not change the bedrock fact in this entire appeal, which is that Anker had no business coming forward in the first place. It's an investment advisor, nothing more. It is not an institutional investor like a mutual fund that has a pool of a billion dollars pool of stocks and bonds. If you didn't have an attorney-in-fact agreement, would that have been sufficient? Yes, it would. We are not saying that an investment advisor can never come in. If an investment advisor has a valid attorney-in-fact power and it's documented someplace, we have no problem with that at all. I would like to reserve the remainder of my time. One last question, counsel. I think it's very simple. Does Massachusetts law govern the relationship here between Anker and its clients? If you're urging us to adopt a rule about investment advisors, are we adopting a uniform rule? Are we adopting a rule that says, well, we're going to look at state law, and state law in this case says, in other words, could we have a different rule even if we had an investment advisor that did not have an attorney-in-fact? Might we have a different rule between Massachusetts and California? No, Your Honor. I think the overriding question of law here is a question of federal law, a question of interpretation of the PSLRA, whether or not an investment advisor with no attorney-in-fact privileges can come in and claim. But state law couldn't create some kind of agency or another relationship that would give them a sufficient interest. Massachusetts wants to see specific language, attorney-in-fact in the writing. They want to see the duties and the privileges laid out. Connecticut may say all you have to do is have a complete discretionary account like Anker had, and that is sufficient to create attorney-in-fact. We would have no problem with that. Good morning. May it please the Court, my name is Seth Aronson. With me is Krista Demicka. We're from the law firm of Mulvaney & Myers. We represent the Watson defendants. We will be splitting our time with counsel for Anker. The reason why I'm going first, Your Honors, is appellants have two fundamental jurisdictional obstacles that they cannot avoid. The first was identified by the court already. They simply lack standing to sue from the final or to appeal from the final order of dismissal. It did not dismiss their claims. In fact, they had no claims. Now, we all know that standing is a threshold issue in any federal action, and only parties to a lawsuit may appeal an adverse judgment. But here, these pension fund appellants were never parties. They never filed a complaint. They never moved to intervene. They never sought to file their own claims after the lead plaintiff requested dismissal. And I submit, Your Honor, there was more than three days within which they could do so. They could have done so at any time before the judgment of dismissal was entered. But there was much more than three days in between the time that Judge Matz ordered dismissal of the case, said they could amend, and if these plaintiffs or these purported plaintiffs had been following what was going on in the case, the case that they claimed they were interested in, they would have seen that Judge Matz did dismiss Anker Capital's complaint. And at that point, they could have stepped in and filed their own claims, but they never did. The class was never certified. Never certified. They're not bound then by the dismissal. Precisely. Has the statute of limitations run? I don't know what claims they have, Your Honor. There's a tolling period. I would just have to see how it lines up. And we have the intervening factor of Sarbanes-Oxley, which came out in 2002, which extended the statute of limitations. There's issues as to whether that would apply and how long it would go. I would really need to see their complaint. It's possible at this point in time, as we sit here today in Pasadena, November 2006, that it might have expired, but they may have the benefit of American pipe. I just don't know what arguments they would make. But going back, Your Honor, even after the case was dismissed by Judge Matz, they never came into the district court and asked to replace Anker Capital, and they never intervened for purposes of appeal. They missed it five ways. All they had to do was any one of those to keep whatever claim they had alive. But they never did. And once Anker Capital dismissed the case. They've got alternative remedies here. They think they've got two ways of going at this. They might have done what you suggested, which is to come back in and just simply file a new complaint, just cure the whole thing, which might have been the simplest thing to have done here. On the other hand, it does appear that after Kavanaugh, our Z7 case, that they've got standing to come back in and challenge the original certification as wrong. Now, that may be a harder road to take, but aren't they entitled to take it? They did not, but they're not parties. They never moved for intervention for purposes of this appeal. Once the court said that you're out, you're not the lead plaintiff, they had remedies. They could have filed a complaint. They could have sought to intervene in the action. They could have sought to intervene in the appeal. Does our prior decision in Z7 require those remedies to be taken before they have standing to appeal? I don't know. They're sort of a disappointed bidder here. Correct. Correct. I wasn't sure that as a disappointed bidder that they had to do anything more than be a disappointed bidder in order to have standing to appeal. Oh, I think that the U.S. versus Oakland case says that in an analogous situation, if they had sought to intervene and the court denied it, they would still need to move the appellate court to intervene for purposes of appeal. There's another jurisdictional problem that they never address, and that is the case is moot. I'm sorry. Back to moving to intervene. They would have to move this court to intervene in what? In the appeal. But there's no appeal. Okay. Well. It's circular because they're the ones who want to file the appeal, and they can't intervene in their own appeal. Correct. But they could have sought to – permission to appeal. They could have sought to be deemed as a party for purposes of appeal. They didn't do that here. But that doesn't matter. What happened down below is what counts. And they never filed their complaint. They never moved to intervene. They never picked up the ball. And once – So is that an exhaustion of remedies argument? I mean, what grounds do we have for dismissing an appeal if they're a disappointed bidder? It is a standing issue, Your Honor. It's a fundamental standing issue. They were never parties to the action. Okay. What's the principal case for it? The principal case is the Marino case, Your Honor, from the United States Supreme Court. The United States versus the city of Oakland. Those cases – and Marino is fairly dispositive on this issue. Okay. And just – we also point out the mootness that once the complaints were dismissed in the underlying action, that there's no pending case or controversy, so their lead plaintiff designation is moot. But even if they got past the jurisdictional issues – and they haven't. In five ways, they haven't. They still never show that the district court erred in appointing Anchor Capital as lead plaintiff. And counsel for Anchor Capital is here, and they can handle that. But they never came forward with any facts for a new complaint. They never said, if we were the lead plaintiff, here's what we would do that's different. Here are new facts, Your Honor, that you have not seen. They never present that. In fact, they don't even appeal from the ruling on the motion to dismiss. So they never show that the ruling on the motion to dismiss was an error. That is a critical error on their part, or they can't do it. Anchor Capital had the facts, and they took the facts as far as they could. Pension funds don't have any additional facts. They've never proffered them to the district court. They never proffered them here. And when Judge Matz told pension funds, you can amend. The only issue at the district court on the motion to dismiss was, do we give them leave to amend? And Judge Matz said, I'll give them one more chance. But he said, you've got Rule 11 issues here. Be mindful of that. We never saw what facts that the pension funds would have that would overcome Rule 11. With that, Your Honor, I've used up, I believe, about 10 minutes of our time, and I'll turn the rest over to counsel for Anchor unless the court has any additional questions for me. Good morning. May it please the Court. Sean Handler, I'm head of Anchor. Your Honor, Anchor is a purchaser under 10B. And as a purchaser under 10B, it had standing to bring suit in its own name. Now, the body of case law that has analyzed whether an asset manager has standing to bring suit has rested on that statutory principle, that Anchor was the decision maker, and therefore Anchor had the authority to bring suit. The idea being that these laws were designed to ensure that those who were actually making the investment decision had full and fair information. That's Anchor. Anchor made the decision to purchase these securities. The laws were intended to make sure that the investor had the information, right? Correct. Correct, Judge. Are you suggesting that Anchor was the investor or that the underlying person was the investor? The underlying person was the investor. Anchor was the purchaser who got... Anchor was the purchaser in the same way that a stockbroker is a purchaser. Just a tool, right? Well, I would submit that Anchor is a little different than a broker. I mean, brokers could simply... It's a tool. It's a tool. It's a tool for their clients, I would agree with that, with the actual beneficial owners of the stock. Beneficial owners remain the investors. Correct. And you're suggesting that the beneficial owners are not the people who would bear the brunt of the loss. I'm not suggesting that, Your Honor. I'm merely suggesting that under 10b that the asset manager, the one who the client assigns to make those decisions for them, qualifies as a purchaser. Are we talking about the 34-Rack 10b? Correct. What does it say anything about advisor in 34-Rack 10b? It doesn't use the word advisor but says purchaser. It says purchaser, right. That means the purchaser, the person who's putting the money up and who's going to bear the brunt of the problems, right? Well, courts have viewed that differently, respectfully, Your Honor. For example, in the Caprock decision that we saw in our papers in the Ezra One case, the courts have said that because the purchaser in this context is the one who's the decision-maker, the one who actually, in this case, looked at Watson, thought it was a good investment alternative for their clients, gathered the information, and made the investment decision, so that in that sense, the decision-maker who was anchor is the purchaser. And then on that foundation, those courts who appointed these third-party asset managers, that's how they base their decision, on that statutory interpretation and on that legal principle. And that stands in stark contrast to the other body of case all that appellants have identified, where there was this, respectfully, there was this rubber stamping of some language, some dicta, from the Ezra One case without any legal foundation, if I can give an example. The first two cases, Ezra One and Caprock, both based their decision on Section 10b and the asset manager status as a purchaser. In Ezra One, there was a statement made by that particular asset manager that he was attorney, in fact, for their clients. Now, Ezra One court was very clear that they weren't basing their decision on that language. They were rather basing the decision on the fact that they had complete investment discretion and therefore qualified as a purchaser. The next case was the Suprema case by Judge Walls in New Jersey. Again, a passing quote to that attorney, in fact, dicta language from Ezra. And then three or four cases subsequent to that all paired that language, respectfully, without any analysis. So what the courts then confronted with here is the choice of case law predicated on 10b, where the asset managers were characterized as purchasers withstanding under 10b and under 17a versus a whole separate body of law, which was born out of dicta from one case. And I will note, at class certification, when the Ezra court had a chance to revisit their decision, Judge McLaughlin specifically said that Suprema, Turkcell, and its progeny misread that Ezra One decision and that the Ezra One decision wasn't based on any attorney in fact language. It was predicated on the complete investment discretion. So that's really the choice the court has in front of it, which direction to go with. Looking at the statute, which I guess is where we have to start, it says presumption is the most adequate plaintiff as a person who has determined that he has the largest financial interest in the relief sought. What's the financial interest of Anchor? To use Judge McLaughlin's words, their financial interest is synonymous with their client's here. If you're asking do they have a personal out-of-pocket loss, the answer is no. But the law doesn't say out-of-pocket loss, it says financial interest. And I would submit to the court that you could have a scenario where, say, an asset manager like Anchor has standing as a purchaser, as a decision maker, but under this provision of the same statute, they would not be able to seek leave plaintiff status simply because they don't have an out-of-pocket loss. And I believe the rules of statutory construction make clear that you have to view the statute as a whole. And that reading, that reading of financial interest as commensurate with out-of-pocket loss or a loss not sustained in a derivative capacity, cannot be reconciled with the notion of when someone is a purchaser under the other part of the statute, under 10B. So all that to suggest that the term says financial interest. If Congress wanted to limit to an out-of-pocket loss or a non-derivative loss, they certainly could have legislated that. They didn't do that. So I think you have to read the statute consistently. And the only consistent reading is that an asset manager like Anchor, who has standing as a purchaser, can, for purposes of a leave plaintiff motion, stand in its client's shoes and satisfy that financial interest requirement. It is quantifiable. It isn't an amorphous business interest that it's been claimed to be. It's real numbers. In this case, it was $3.2 million. So it does allow, within the four corners of Kavanaugh, a court to rank the various applicants and determine who has the largest financial interest and proceed accordingly. Are you relying at all on the language of the Massachusetts Supreme Court, which at least seems to imply that asset managers have an obligation to protect the investment they've advised? I view that argument somewhat as an argument in the alternative. I think the complete investment discretion gives them the standing under 10B, but to the extent there is discomfort with the notion that, okay, the clients are aware that this is taking place, mindful of the fact that it's taking place in their advisor's own name. It's not taking place in the client's name. That there is a fiduciary relationship here. The appellants can see in their papers that there is a fiduciary relationship. And as this Court has acknowledged in previous opinions in the Inwood v. Lines, there are certain acts that fiduciaries can take that are reasonable for the performance of the trust. And we would view an asset manager who takes monies from someone, invests them, loses money, and then thinks that there's fraud at play, can naturally protect those losses by engaging outside counsel and taking an active role in the lawsuit if they so feel. I mean, that's a personal decision. But we view that as a reasonable use of their fiduciary duties to take this step to protect those interests. Judge, does Anchor have any personal loss here? No. They weren't self-investing? There's no fees that they might be able to recover from their clients if they can recover something from them? Not that I'm aware of, Your Honor. It's truly standing in their client's shoes for purposes of financial interest. Now, courts have sometimes identified these other incentives that they want to have, you know, perpetuate their business relationship with their clients. But I would agree that that's amorphous and you can't really expect to put a number on that. That might go to whether they're more incentivized than somebody else. But for these purposes, for the financial interest purposes,  it's a real number, it's a real figure that the court can use in order to fulfill the Kavanaugh steps and sort the relevant lead plaintiff movements. I think you may have responded in part to this question to Judge Nelson, the same question I put to Mr. Daley. Do we have to look to state law here or are we looking for a uniform national rule when we get to investment? I think you're looking for a rule, particularly in this context, where the agreement simply says complete discretionary management. So as long as we have something that says complete discretionary management, that will satisfy us irrespective of state law? It's my understanding, yes. Now, if the agreement is more particularized and, for example, did have an expressed power of attorney, then I believe it would be more of an interpretation of state law whether that power of attorney satisfied the state's requirements. But here, there was no power of attorney. There simply was a contract to convey complete discretionary management. Everyone's conceded that that creates a fiduciary relationship. So the issue is where a plaintiff has complete discretionary management, is that in and of itself enough to confer stand? If there's nothing further, I'll rest. Okay. Mr. Daley? Thank you, Your Honor. I'm just going to hit about four points very quickly. Number one, I was glad to hear Anchor's counsel say that you can't have an amorphous interest as an investment advisor, but that's exactly what Judge Mats thought was going on here. My colleague pointed out to the judge that Anchor Capital didn't have any financial... You have questions about that. You ultimately seem to resolve that against you, though. Against? Well, but I'm just saying this is one of the judge's rationales. In the real world of money management, if they can limit or fully recover the claim losses of their clients, keep their clients' confidence, there is a pretty concrete incentive. I mean, that was the thinking of the judge at that point. The Watson Pharmaceuticals counsel says that we never tried to come in had we been following the case. But that's the nature of the class action. When there's been a lead plaintiff appointed, we are allowed, we are expected to sit on the sidelines and watch our champion go into battle for us. He says we did not bother to come in. He said the three-day turnaround was much too quick. Counsel, at what point would a class have been certified? What was the district court waiting on? What were the parties waiting on? I don't know. I honestly don't know, Your Honor. You were looking to see what happened in a First Amendment complaint? I just don't know. I would think ordinarily certification decisions are made fairly quickly in the case. I would think from a defendant's standpoint, they would want a certification decision made. That way they can have a res judicata if, in fact, they're successful in a motion to dismiss with prejudice. But until that class was certified, you still had an obligation to represent your clients in all of this, right? Yes. If they had never sought class certification at some point, you would have had to have come in and filed your own complaint. But you pointed out earlier, Judge Vibey, that we actually had two courses to take, and we apparently chose to take the more difficult course, and that is very early in the litigation, we made our best shot at being appointed lead plaintiff, not just our clients, but on behalf of the class. We were shot down, but we were shot down, we thought, erroneously. We thought the district court judge flouted the language of the statute. And this court's decision in Z-7 said that we could take an appeal from that erroneous decision once there was a final judgment entered in the case. That's what we did. I know Watson's counsel is railing against us for not having intervened, but to what end? I mean, what were we supposed to do after having just been told not once, but twice within the course of four months that we had no business being there as a lead plaintiff? We certainly couldn't come in as permissive intervention, because that would rely upon the district court's discretion, and we know what he thought of that. We could not come in intervening as of right, because we would have to show that whoever was leading the litigation right then was not protecting our interests adequately. Well, that also was already wrapped up in the lead plaintiff's skirmish a few months earlier. He had listened to our complaints. He had seen the non-evidence come in. He had seen the contract come in that omitted any mention of attorney-in-fact, but nonetheless he made his decision. Let's say that we agree with you. What then? In other words, we tell the judge, well, you really should not have done what you did, so go back and do it again. But now the complaint's been dismissed with prejudice, so what do you succeed to? That is that complaint. That is their complaint. Go back and, Judge Matt, reopen lead plaintiff hearings. We are the presumptive lead plaintiff, perhaps under the typicality. There's nothing for him to base that upon unless their complaint is reinstated. I don't understand what you mean, Judge. There's no case. There's no case so far as Anchor Capital's complaint goes. Yeah, and you haven't filed anything. And we don't have to. Under the statute, we do not have to. The PSLRA specifically allows people to get complaints someplace, though. Isn't the federal rules say that the case starts with a complaint? Yes. I'm sorry. I misunderstood. I thought you meant we had to have a complaint waiting in the wings. I'm sorry. Yes. We filed the complaint, but the judge would have to reopen. I'm sorry. Let me back up a second. The statute says the people that move for lead plaintiff don't even necessarily have to have filed a complaint. Fine. We have to go back and tell the judge to reopen the lead plaintiff hearings. But as you pointed out, that complaint has been dismissed. It was asked to be dismissed with prejudice. So I imagine we would have to come in simultaneously with our own complaint at the same time. And I'm sure we could do that. Why don't you just file the complaint and not worry about us? I'm wondering that myself. I'm wondering that myself why we didn't do that. But we didn't. The record is what it is. But I'm going to go back to Judge Duffy's question, because I think it's a very good one. If we were to restore you to ‑‑ if we were to come in and say, Judge Mace, you made an error, and the pension fund should have been certified as the lead plaintiff, what do we do? Revive a more abundant complaint? We revive Anchor's complaint that's now been dismissed? This is a very ‑‑ this is quite a thicket here. I admit that. I think we would have to go back in with a newly filed complaint filed on behalf of ‑‑ Which you can do now, but you've not done. Which we can do now. Yeah, but now you could go in and file a complaint now, tomorrow. We wanted this court to straighten out the district court's lead plaintiff order, which aggrieved us, which we have standing to appeal. Which is a practical matter. If you went in and filed a complaint and said, reopen the dismissal. They want it dismissed. Let them dismiss. We want to file another complaint. That maintains the case, and you say, okay, now we're the second. They're out as lead counsel. We're the second counsel. We're the second lead plaintiffs. Why isn't it all done? I don't know why it's not all done. Whose fault do you think it is? Judge Maitz's, that it wasn't done? Or do you think it's ours? Or do you think it's yours? Your clients. I don't care who you name. I think the fault lies with an investment advisor coming in and saying that it has attorney in effect. No, I didn't ask you that at all. I'm sorry? Look, they're out of it. All right? They're out of it. Now, who's left? You, and us, and Judge Maitz. Okay? Now, if there's a problem, and you're saying, oh, well, that's the way it happened, and that's the way it happened, well, you know, don't blame me for it. I'm not blaming you personally, and no one here is blaming you personally. I don't think I said don't blame me. You could blame me if you want, but. I acknowledge. Complaint tomorrow, counsel. Doesn't that moot this appeal? Say that again? If you file the complaint tomorrow, wouldn't that moot this appeal? It may very well moot this appeal, just as the requested dismissal with prejudice mooted the pending mandamus petition, but I suspect it would open up a thicket. It would open up just a can of worms regarding American pipe tolling and statutes of limitations. So perhaps it is better to just go back and. . . But you could also confront those questions, and this appeal could be put on hold pending resolution of those questions, couldn't it? Interesting thought. Could we really tell Judge Matz to reopen a case that is not before us? In other words, that had case number 101, and it's dead. It's over. It's finished. And if you're going to get into court, you've got to file something with a new case number, don't you? Case number 102. All right, then you're going to take a hard look at case number 102. How do we bless the filing of case number two by telling Judge Matz, well, one of your decisions in case 101 was perhaps erroneous, but they're going to file a 102, and you'll have to take an independent look at 102. How can we help you with that from here? Well, Judge, this particular procedural posture is a first one for me, but I imagine when there are erroneous discovery orders that then taint the entire remainder of the litigation, even litigation that has gone forward to its ultimate resolution, what happens then? I mean, if there's been an erroneous discovery order that egregiously affects one of the parties. But then we can always look at the prejudice. In other words, the bottom line on discovery is were the party prejudiced? How were you prejudiced by this order when it comes down to what you're going to do next? What you want to do is get into court, be lead plaintiff, have your client be lead plaintiff, you be counsel for the lead plaintiff, and go after the bad guys. Agreed. But what that's gone on before keeps you from doing that. But then the alternative then is to leave that erroneous lead plaintiff decision out there in the federal reporters, and it'll be there, and we're going to see this issue. I think it's very touching that you're that concerned about the state of federal law, but you've got a client breathing down your neck here, too, which ought to be a higher concern, I think. Agreed. Do we have a published opinion in this case? Do we have something in f-sub second? I don't know. All right. That's all the questions I have. Thank you, counsel. Thank you. Thank all counsel. And pension versus watch the pharmaceuticals is submitted.
judges: T.G. Nelson, Bybee, Duffy